FILED
03 JAN 30 PH 2:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

KINNEDY BELL,

    Plaintiff,

vs.                                CASE NO. CV-02-J-1091-NE

OCI TELECOMMUNICATIONS, INC
and KNOLOGY OF HUNTSVILLE,

    Defendants.

ENTERED
JAN 30 2003

## MEMORANDUM OPINION

    Currently pending before the court is the defendants' motion for summary judgment (doc. 27), evidence in support of said motion and a memorandum of law. The plaintiff has failed to respond to said motion.[1]

    Plaintiff commenced this action by filing a complaint alleging defendant OCI Telecommunications, Inc. ("OCI") discriminated against him on the basis of race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII") and 42 U.S.C. § 1981. The plaintiff also named Knology of Huntsville as a defendant, but states no claim against Knology and provides no evidence that he was a contractor of Knology. Upon consideration of the pleadings, memorandum of the defendants and evidentiary submissions, the court

---

[1] Pursuant to the Scheduling Order entered by this court on July 30, 2002, and Exhibit A, "Summary Judgment Scheduling Order," attached thereto, the plaintiff had fourteen days to respond to the defendants' motion for summary judgment. This motion having been filed January 8, 2003, the plaintiff had until January 22, 2003 to submit a response.

30

concludes that the motion for summary judgment is due to be granted as no genuine issues of material fact remain and the defendant is entitled to judgment in its favor as a matter of law.

## FACTUAL BACKGROUND

In the light most favorable to the plaintiff, the court finds the facts of this case to be as follows:

Defendant OCI is a cable installation company which installs cable for defendant Knology of Huntsville's customers pursuant to a contract between the defendants. Affidavit of Frank Ortega, submitted as defendants' Exhibit C, and affidavit of Christie McCool, submitted as defendants' Exhibit E.

Plaintiff saw an ad for cable installers for OCI in the newspaper. He called and was told he needed a truck, basic tools, and commercial insurance. Plaintiff depo. at 19. Prior to obtaining these items, the plaintiff voluntarily rode (without pay) with Mark Allen, project manager, for a week, to learn the job. *Id.* at 22-23. During that week of volunteering, the plaintiff also rode with other installers – Dave, Joe and DeWayne. *Id.* at 25. Plaintiff was hired by Mark Allen in mid-September, along with Chris Williams, Brett and Sloan, as an installer. *Id.* at 23, 27, 30, 33, 131. Plaintiff then had two weeks of paid training at Knology. *Id.* at 28-29. After that training, he rode with other installers, one of whom was David Hughes. *Id.* at 31, 132. At some point, the plaintiff began working alone. *Id.* at 31-32, 133.

Mark Allen gave the plaintiff his job assignments until the plaintiff was transferred to the construction crew under Jeff McDonald. Plaintiff depo. at 35-36. After that, Jerry Hicks was his project manager. *Id.* at 36.

Plaintiff asserts he suffered racial discrimination the entire time (two months) he worked for OCI. Plaintiff depo. at 41. After riding with David Hughes one day, they went to Hooters together. *Id.* at 42. While there, plaintiff asserts Hughes said to him "not to trip off if he said nigger to me." *Id.* Hughes then introduced plaintiff to his girlfriend, who worked at Hooters. *Id.* Plaintiff and Hughes were not at work during this conversation.[2] *Id.* at 43-44. Within a week of this conversation, plaintiff told Mark Allen about it, because "it was a clear indication to me that, you know, I would probably have some problems ... And I felt like as my project manager, he had a responsibility to make sure that he talked to these folks and told them, hey look, I don't care what you feel, you can't do this when we're working." Plaintiff depo. at 49-50. He reported the conversation out of concern for something that might happen in the future. *Id.* at 53-54, 140. Plaintiff does not know if Mark Allen did anything in response to this conversation. *Id.* at 54.

Plaintiff alleges that other installers did not respond to his calls because of race discrimination. Plaintiff depo. at 51-52, 85, 87. The only person that would call him back was Mark Allen. *Id.* at 87. David Hughes helped him on one occasion. *Id.* at

---

[2]Plaintiff occasionally joined the other installers for beer and food after work at Hooters or Ruby Tuesdays. Plaintiff depo. at 45.

3

88. Plaintiff does not know why other installers did not call him back or what they were doing when he called. *Id.* at 91-92.

The plaintiff also alleges that he did not have a two-way radio like some other installers did. *Id.* at 85, 115. However, OCI asserts that it does not provide installers 2 way radios. Mabry affidavit, defendants' Exhibit D. Plaintiff also alleges he was not given a decibel meter, which he needed to do his job, in Aikin, because he was black.[3] Plaintiff depo. at 114-115.

Plaintiff went to a meeting in Aikin, South Carolina, on October 6 or 7, 2000, when they were issued tools. He told Frank Ortega (the owner of OCI) that no one would answer his calls. Plaintiff depo. at 94, 95, 97-98. After this, plaintiff overheard either Brett or Sloan say something about "if this boy ain't careful, he won't be making it home." *Id.* at 96.

On one occasion, the plaintiff states he tried to get permission from Mark Allen to install a wall box for a customer, and was told instead to put it in a work order.[4] Plaintiff depo. at 55-57, 61-62, 65, 69. Plaintiff argued with him over being told no, after which Mark Allen told him he would no longer be needed and to return his tools. *Id.* at 57. This was on or about October 20, 2000, approximately one month after he

---

[3]However, plaintiff states he was installing high-pass filters, which do not require a decibel meter. Plaintiff at 116, 133. When he did installations, for which he says he needed the meter, he did them without one. Id. at 116-117. OCI did not provide decibel meters to new installers. Mabry affidavit, defendants' Exhibit D.

[4]Plaintiff states this work was different than what he had been sent out to do and he had not done this before. Plaintiff depo. at 66-68.

4

was hired. *Id.* at 57, 80. Plaintiff called Garrett Conner, Vice President of Operations, because he felt like Mark was trying to fire him for no reason.[5] *Id.* at 59, 119. During this conversation, the plaintiff told Garrett that he felt he was racially discriminated against in job assignments and fired by Mark because of race, not because of the authorization to do the installation of the wall box. *Id.* at 121, 123, 124. He bases this on the "overall way I felt when I dealt with most of the guys." *Id.* at 125. Garrett told the plaintiff if he felt like somebody was bothering him, he would move him to another crew. *Id.* at 119. Plaintiff alleges that Mark Allen was angry his decision to terminate the plaintiff was overturned. *Id.* at 119-120. However, the plaintiff also states Mark told him that he was transferring him so if anyone on the crew was bothering him, they would not bother him anymore.[6] *Id.* at 147-148, 150, 154. Conner transferred him to the MDU (construction) crew under Jeff McDonald. *Id.* at 60, 110, 118-119, 142, 147.

The same day he was transferred to the MDU crew, the plaintiff walked into the waiting room where several other installers were discussing a bachelor party for one of the installers. Plaintiff depo. at 78-79. Craig Bonanno said to plaintiff, "we'll

---

[5]Plaintiff testified he talked to Garrett Connor on October 20, 2000, and then Jay Mabry, about no one answering his calls. Plaintiff depo. at 98-99, 130. However, plaintiff also testified that this conversation with Garrett was because of his termination by Mark and concerned race discrimination issues. *Id.* at 135.

[6]As of this date, plaintiff's complaints included the comment by David Hughes, at Hooters, the comment by Craig Bonanno, about the bachelor party, and that his calls were generally not returned. Plaintiff depo. at 148-149.

5

bring the beer, you bring the chicken and watermelon." *Id.* at 78-79. The plaintiff testified that he "played it off." *Id.* at 79. About the same time, DeWayne Jones was loading tools outside, and plaintiff complained to him he got fired for asking for more work. Jones responded the employer should not be OCIC but rather ACC for "all Caucasian contractors." *Id.* at 83. The plaintiff states he backed up and "like, laughed, like, okay man ..." *Id.*

The plaintiff further alleges, before he was transferred to the MDU crew, he was given jobs which were more difficult compared to other installers. Plaintiff depo. at 70. On one occasion, he was sent to do an install over a ditch with a wasp nest, which had originally been assigned to Chris Williams. *Id.* at 70-72. Plaintiff states this assignment and not being allowed to do the install of the wall box show he was discriminated against, because other employees were getting more work and hence more money.[7] *Id.* at 72-73. Also, he was given three appointments at spread out locations all for the same time which was not physically possible for him to do. *Id.* at 73. Plaintiff does not know if this was different than the scheduling for other installers, but states that, from hearing them talk, they had assignments closer together. *Id.* at 74.

---

[7]In essence, plaintiff is asserting he was set up to fail by Mark Allen, who hired him a month earlier. Work orders were actually generated by Knology, and then randomly assigned to installers. Mabry affidavit, defendants' Exhibit D.

The plaintiff also states he did not get a uniform because of race discrimination. Plaintiff depo. at 93. Chris Williams, who is white, got a uniform. *Id.* at 106. They were both sized for uniforms in late September. *Id.* at 94. After being moved to the MDU crew, he was told that crew had T-shirts, not uniforms. *Id.* at 94. About a week before he was fired, the plaintiff called Jeff McDonald, who told Mark to get the plaintiff some T-shirts. *Id.* at 104-106. Plaintiff states this call was in response to the manager of the apartments where he was working telling someone else in plaintiff's hearing that she did not want plaintiff on the property without a uniform. *Id.* at 105-106. However, plaintiff also asserts that Garrett Conner said he needed a uniform on the MDU crew too. *Id.* at 103. Plaintiff also asserts that while on the MDU crew, another employee told him that, before he was saved, he didn't like black people. *Id.* at 155, 158, 160. He was on this crew from October 20 to November 17, 2000, when he was terminated. *Id.* at 102-103.

After he was terminated, Mark Allen told him his uniform was returned at Garrett Conner's request. Plaintiff depo. at 100. Mark also told him Jerry Hicks and others were known racists. *Id.* at 109, 139, 141. Jerry Hicks told the plaintiff he was fired for cracking a baseboard and taking a jumper from the back of a TV. *Id.* at 111, 161, 164. The plaintiff alleges he did not do these things and was never in the apartment where they happened. *Id.* at 111, 162. He states other people were not fired for causing property damage. *Id.* at 112-113. However, he does not know if any of these people still work for OCI. *Id.* at 113. Plaintiff also states he was told he was

terminated for threatening an employee of the apartments where he was working. *Id.* at 165-166.

Linon Mabry, regional manager for OCI, states that Garrett Connor told him he fired plaintiff because "the lady at an apartment complex that we were working said she didn't want Mr. Bell back on her property" because he was harassing some tenants by talking, rambling on, and not doing his job. Mabry depo. at 25, Mabry affidavit, defendants' Exhibit D. This woman told Mabry the same thing. Mabry depo. at 26. Mabry states that plaintiff was terminated because his work was not performed at an acceptable level. Mabry affidavit, defendants' Exhibit D. Jerry Hicks, Cameron Dutton, Craig Bonanno, and Preston Bonner have all been terminated by OCI for property damage. Mabry affidavit, defendants' Exhibit D. Mark Allen was terminated four days after plaintiff. *Id.* Plaintiff states he attributes the problems he had to Mark Allen. Plaintiff depo. at 177.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.R. Civ.Pro. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249. The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving

party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

## LEGAL ANALYSIS

Plaintiff asserts solely that the above facts constitute race discrimination under 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Whether this case is pursuant to 42 U.S.C. § 2000e or § 1981, the same substantive proof is required and analyzed under the same framework. *See e.g., Bass v. Board of County Com'rs, Orange County, Florida*, 256 F.3d 1095, 1109 n. 4 (11th Cir.2001); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). For a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees more favorably; and (4) he was qualified to do his job. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263,

1286 (11th Cir.2000). Plaintiff is a member of a protected class and he was terminated, which is an adverse employment action. However, plaintiff has provided no evidence that his employer treated white similarly situated employees more favorably. Plaintiff has produced no evidence that any of the complaints he had resulted from his race.

The plaintiff testified he did not know why no one would respond to his calls, he stated his job installing high-pass filters did not require a decibel meter and he did installations without one anyway, and the plaintiff produced no evidence that defendant issued two-way radios to white installers. OCI asserts it does not provide two-way radios, or issue decibel meters to new employees. Plaintiff has produced no evidence otherwise. As to the failure to provide plaintiff with a work uniform, no evidence that white employees on the MDU crew had uniforms has been presented. Rather, the evidence tends to show they had t-shirts, which plaintiff got. Plaintiff has also failed to produce any evidence that white installers were given more favorable job assignments. Plaintiff failed to establish that other installers who caused property damage were not terminated. Rather, OCI produced evidence to the contrary.

The court takes plaintiff's allegations of discriminatory comments as an attempt to state a claim for hostile environment discrimination. To establish a prima facie hostile environment claim, the plaintiff must show that the actions of the defendant altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995). *See also EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir.1990).

11

If the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is sufficiently severe to "alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370 126 L.Ed.2d 295 (1995). In *Edwards,* the court noted that for racial slurs of co-workers to create an "atmosphere charged with racial hostility" the comments must be "commonplace, overt and denigrating." *Edwards*, 49 F.3d at 1521. As the Eleventh Circuit has observed, Title VII was not meant to be a federal "civility code." *Mendoza v. Borden Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999). Rather, establishing that harassing conduct was sufficiently severe or pervasive to create a sufficiently hostile environment so as to alter terms or conditions of employment includes a subjective and an objective component. *Mendoza,* 195 F.3d at 1246, citing *Harris,* 510 U.S. at 21-22, 114 S.Ct. S.Ct. 367.

In addition to the employee perceiving the harassment as sufficiently severe and pervasive to alter the terms or conditions of her employment, his subjective perception must be objectively reasonable. The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive." *Mendoza*, 195 F.3d at 1246. As to the objective reasonableness of the plaintiff's perception, the court must consider the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. *Edwards,* 49 F.3d at 1521-1522.

12

Of the comments at issue, one, by Hughes, was at a social gathering, by the same installer that plaintiff states was the only one who responded to one of his calls for assistance. Another comment, by Bonanno, was in regard to what he should bring to a bachelor party and apparently an isolated comment. A third was by another installer concerning the name of the business and the sole comment by that installer. The fourth was said to another installer about making it home from Aiken. At best, plaintiff has established four comments over two months by four different co-workers at four different times. Thus, all the plaintiff has shown are four isolated incidents, one of which, the only one plaintiff reported, was not even during work hours.

All of the above allegations taken together do not create any evidence that the plaintiff was terminated because of his race, or even suffered from a hostile environment. Plaintiff could think of only four comments in two months. Plaintiff did not testify they interfered with his ability to do his job. Plaintiff's only complaint to his supervisor was that he might, in the future, have a problem. Additionally, none of the co-employees who made comments were decision makers and thus, the court finds no evidence of any relationship between the four comments in question and the plaintiff's termination. *See Miller v. Bed, Bath & Beyond*, 185 F.Supp.2d 1253, 1272 (N.D.Ala.2002).

Plaintiff also asserts he was retaliated against in violation of Title VII. To establish a prima facie case of retaliation, plaintiff must show: (1) he engaged in protected activity; (2) his employer was aware of that activity; (3) he suffered adverse

13

employment action; and (4) there was a causal link between her protected activity and the adverse employment action. *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir.1999). The plaintiff was terminated, which is an adverse employment action, but does not state what protected activity he engaged in which caused the retaliation.

Plaintiff stated he complained about racial discrimination to Mark Allen and Garrett Conner. Assuming this is his claimed protected activity, at the time he spoke with Mark Allen, he did so in case some problem arose in the future. His conversation with Conner was that no one would answer his calls. Plaintiff attributed this to his race, but has no evidence of it. Neither of these complaints actually involved any racial discrimination. Thus, these are not protected activities. Because the plaintiff cannot establish any protected activity, he cannot show any causal connection between protected activity and an adverse action, as required for a retaliation claim. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001).

OCI offered legitimate, non-discriminatory reasons for plaintiff's termination. Plaintiff thereafter failed to produce any evidence that these reasons were pretextual. As such, the court finds that the plaintiff's claims against the defendants are due to be dismissed as a matter of law.

## CONCLUSION

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendants' motion for summary

judgment is hereby **GRANTED**. The plaintiff's claims are **DISMISSED WITH PREJUDICE**. Each party is to bear its own costs.

**DONE** and **ORDERED** this the 30 day of January, 2003.

```
                                    _____
                                    INGE P. JOHNSON
                                    UNITED STATES DISTRICT JUDGE
```